UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 3:05CR0075 (RNC) |
| | : | |
| v. | : | |
| | : | |
| EVAN P. CHAGGARIS | : | |

## SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in aid of sentencing, which is scheduled for May 8, 2006 at 1:00 p.m.  The memorandum recounts the factual and procedural background to this matter.  *See* Part I.  Second, it outlines the procedure to be followed in sentencings in the wake of *United States v. Booker*, 125 S. Ct. 738 (2005).  *See* Part II.  In Part III of this memorandum, the Government respectfully recommends that the Court sentence the defendant within his Sentencing Guidelines range, but defers to the Court's discretion as to whether a departure due to the defendant's diminished mental capacity is warranted and appropriate in this case.  *See* Part III.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      The Defendant's Offense Conduct

The defendant, Evan P. Chaggaris, is a thirty five year-old male who lives in Atlanta, Georgia.  ESPN is a twenty-four hour sports programming network, which is located in Bristol, Connecticut.

Since approximately March 14, 2004, the defendant repeatedly has harassed and has threatened to injure and kill certain ESPN sportscasters.  The defendant has made these threats in two manners: (1) by sending handwritten letters to ESPN via the United States Postal Service

and (2) by making interstate telephone calls from Atlanta, Georgia to Bristol, Connecticut and leaving threatening voice messages for certain ESPN sportscasters.

### 1.      Threatening Letters

Between March 14, 2004 and January 8, 2005, ESPN received approximately thirty-one handwritten letters containing harassing, profane and offensive statements, racial and ethnic slurs, and threats of violence -- including death threats -- directed to ESPN sportscasters. All thirty-one letters were handwritten by the defendant and sent by mail to ESPN. Many of the letters were signed "E.P. Chaggaris." All of the letters contained offensive and harassing statements and many of the letters contained threats to injure ESPN sportscasters.

Twenty-four letters were sent between March 14, 2004 and May 10, 2004. Each of these letters contained a return address of 2206 Queen Anne Court, Dunwoody, Georgia. In May 2004, Fulton County police interviewed the resident (hereinafter "TW") of 2206 Queen Anne Court, Dunwoody, Georgia. TW denied any knowledge of the harassing and threatening letters. TW stated that TW befriended the defendant at a bar and the defendant asked if he could use TW's residence as a mailing address. According to investigative reports, the defendant was made aware that a complaint was made against him relating to the harassing and threatening letters that he had sent to ESPN. According to the reports, the defendant indicated that he would stop sending threatening letters as a result of the complaint lodged with the Fulton County Police Department. The defendant did not send any threatening letters from on or about May 10, 2004 through on or about October 16, 2004.

In October 2004, however, the defendant again started sending threatening letters. The defendant sent seven letters to ESPN between October 16, 2004 and January 8, 2005. None of

the letters contained a return address.[1]  If anything, the nature of the threats contained in the

letters were more serious than those contained in the earlier sent letters.  The defendant's threats

included the following:

- "You tell this F***en' A**hole [Sportscaster B] . . . I'll be happy to go to Bristol and put a Bat to his head!"

- "Fire [Sportscaster A] Or I Swear On My Late Mother And Father's Lives, I'm Gonna Kill This Son Of A Bitch."

- "I'll Move Up To Bristol Or Surrounding Areas [and] Hunt [Sportscaster A] Down Like An Animal And Make It My Goal To Put Him Out, So He'll Never Appear On Your Show Again."

- "[I am] Setting A Goal To Find [Sportscaster A] In Bristol [and] Pound Him Within An Inch Of His Life."

- "I'm Not Leaving [the State of Connecticut] Until [Sportscaster C] Dies Or Gets Paralyzed So He Never Works Again."

- "[Sportscaster A] is Going To Get Put In The Hospital, Anyway.  Every Day That Heb Goes On [the air is] Another Time That I Ratchet Up The Courage To Beat The Hell Out Of Him" . . . "I'm Going to Put His A** Out Plan and Simple So He Never Works Again, Plain and Simple."

- "Tell [Sportscaster A] That I'll Be Up There To Take His A** Out - That's My Resolution For 2005 . . . I Will Kill This Cockroach, Count On It - And Wait There Until The Job Is Done . . . Trust Me, He's Going Down."

- "If I See [Sportscaster A] Again, Hitler Kills The Jews, I'll Pull A Mem Kampf, And Take Out This Motherf***er!  This A**hole Wants To Mess Around, I'll Kill [Sportscaster A]!"

- "Get [Sportscaster E] Out Of There Before I Kill Him."

- "I'm Going To Bristol And Break [Sportscaster F's] F***en Head, Kick His A**..."

---

[1]One of the letters was sent in an envelope with a pre-printed return address that was crossed out with a black marker.  A close examination of the envelope, however, revealed that the pre-printed address was the address of the business where the defendant worked.

- "I'm Going To . . . Go Back Up To Boston . . . And Kill [Sportscaster D]."

In or about January 2005, law enforcement officers investigating this matter interviewed the defendant's employer and the manager and other residents at the motel where the defendant was living.  Soon thereafter, ESPN stopped receiving threatening letters and voice messages from the defendant.

### 2.    Threatening Voice Messages

In addition to the threatening letters, between October 2004 and January 2005, the defendant left at least six threatening voice messages for two sportscasters at ESPN.  These threatening voice messages are set forth below.

The defendant left the following voice message on Sportscaster A's voicemail on October 27, 2004:

> "You can take your New York Jew a** and go the f***en home.  I'm glad you're on tonight you mother f***er because you got to see history, you f***ing New York f***ing c***sucker.  They won and every f***ing curse and everything you f***ing idiots from that city and nationally are done and I'm going to go up there and beat you're a** anyways.  F*** you."

The defendant left the following voice message on Sportscaster A's voicemail on November 29, 2004:

> "Look Kike, I don't need you coming on every f***ing night, alright.  I'm gonna rip you f***ing Jewish f***ing Kike eyeballs out.  I'm not in the f***ing mood to f***ing listen to you every f***ing night.  Get the f*** off, cuz I'll go up to Connecticut and rip your Jew eyeballs out, alright Kike."

The defendant left the following voice message on Sportscaster A's voicemail on December 29, 2004:

> "You not only f***ing waited till I got back to Atlanta to f***ing go on the goddam airwaves, I'm gonna go back to f***ing New York, back to Connecticut, back to Boston

4

to rip off you Jew head, your f***ing kike a**.

Are yon f***ing kidding me?  You f***ing tell those bastards at f***ing ESPN.  I'm gonna hunt your f***ing Jew a** down for this stunt, you f***ing c***sucker, you f***ing kike a**.  I want the Celtics to know what the f*** you're doing, you Jew f***ing Heb.

Are you f***ing kidding me?  Tape it; I don't give a f*** what you do with it.  Send it to the Goddam FBI, I'll f***ing let them know what the f*** you're doing.  I'll rip off your f***ing Kike A** Jew head, you f***ing Kike.

Are you f***ing kidding me?  You f***ing thieving little f***ing Kike.  You f***ing waited til I got back to the South so your f***ing Kike A** could go on.  I'm gonna go back up there over the f***ing weekend and rip off your f***ing head, you Jew.  F*** you."

The defendant left the following voice message on Sportscaster A's voicemail on January 4, 2005:

"Look Kike, I don't give a shit if you are on every f***ing day for the rest of 2005.  I'm going to f***ing hunt you're a** down and I'm going to f***ing kill you.  OK, I will f***ing end you, trust me.  I don't give a f*** what type of bullshit game your playing.  I will find you, I will take out your f***ing goddam Kike neck and f***ing end you, you f***ing son of a bitch.  You hear what I am saying.  F***ing get the goddam FBI, get the goddam CIA, I don't give a shit what you f***ing do.  Get your f***ing a** out of the goddam state of Connecticut because I'm going up there and I'm going to hunt your f***ing a** down, you hear me."

In addition, another ESPN sportscaster (i.e., Sportscaster D) received two threatening voice messages from the defendant.  The first voice message, which was left on Sportscaster D's voicemail on October 13, 2004, states as follows:

"I told you what I would do if I saw you before the end of the month.  I'm coming up there next week.  You better get the f*** out of the state because I am going to beat the hell out of you.  I know you can hear me and you can see me now as you do Sportscenter.  I'm going to go up there and I'm going to beat the shit out of you.  You better get the f*** out of there.  I am not f***ing lying, I am as serious as a f***ing heart attack.  You better leave the f***ing state a**hole, because I'm gonna come to get you."

5

The defendant left a second voice message on Sportscaster D's voicemail on October 16, 2004.  The second voice message stated as follows:

> "Buddy, I don't care how man times you can go on.  You can go on every f***ing day until your lips fall off.  When I get back up to the Northeast, I'm gonna f***ing hunt your a** down and I'm going to beat the shit out of you so bad you're never going to go on again, ever.
>
> Go on as much times as you want, I don't care.  I don't care if the f***ing Yanks win 10 to nothing, I don't care if they win 18 to nothing.  I'm gonna f***ing hunt you f***ing slimy c***sucking a** down and I'm going to beat the f*** out of you.  That's it, there's no, you already pushed me pa**ed the point and its my time to react.
>
> You're going down.  You better leave the f***ing state.  You can go on every f***ing day known to man.  I will f***ing hunt you down and f***ing kick the shit out of you. Trust me.  If my mother and father hear me now from heaven, I will f***ing hunt you down and beat the living shit out of you, you f***ing c***sucker."

As discussed above, law enforcement officers interviewed the defendant's employer and the manager and other residents at the motel where the defendant was living in or about January 2005.  Soon thereafter, the defendant stopped leaving threatening voice messages for ESPN sportscasters.

### B.    The Defendant's Post-Arrest Statements

On March 25, 2005, federal agents arrested the defendant in Atlanta, Georgia.  After being advised of his rights and of the charges against him, the defendant waived his rights, both verbally and in writing, and agreed to speak with the agents.  The defendant stated that he did not realize that sending threatening mail and threatening telephone messages was a criminal offense. The defendant further stated that he deeply regretted making those threats to ESPN and stated that it would not happen again.  The defendant stated that the reason he was angry with ESPN was because he is a telemarketer and part of his sales pitch dealt with sports issues.  The

6

defendant believed that ESPN had his work phone tapped and that ESPN was stealing his sales pitch that he would give to potential clients.[2]

###   C.   The Defendant's Post-Arrest Criminal Conduct

_____After his arrest in March 2005, the defendant was presented before the District Court for the Northern District of Georgia and was released on a $25,000 non-surety bond.  The standard bond conditions were imposed, including the condition that the defendant not commit any offense in violation of federal, state or local law.  In addition, the defendant's travel was restricted to Georgia and Connecticut and the defendant was required to participate in mental health treatment.

On or about September 26, 2005, the defendant sent a threatening letter to the Sporting News in Chicago, Illinois.  This letter, like the letters sent to ESPN, was handwritten by the defendant.  Once again, the defendant, using offensive and profane language, threatened to physically injure and kill a sportscaster.[3]  Specifically, the defendant's letter included the following threats:

> "I do not need [Sportscaster G] f***ing up my mondays.  If this is going to be the case, I will f***ing take next Monday off and go up to Chicago and kill that f***en son-of-a-bitch. . . . I will kill that motherf***er if he thinks I'm f***ing around.  He will find out how serious I am!  This is not a joke - I will dedicate my life to finding that f***en a**hole and I will not rest until that motherf***er is in the ground!  He better get that across or he's f***en dead!"

---

[2]In several of his threatening letters to ESPN, the defendant made reference to his belief that ESPN was monitoring his telephone calls.

[3]In addition, the defendant sent at least eleven handwritten letters to the Sporting News between January 2004 and April 2004 which contained offensive and harassing statements and threats to injure other persons.  Some of these letters referenced the defendant's belief that the Sporting News was listening to the defendant's telephone calls.

The Government and the United States Probation Office learned of this new criminal conduct after the defendant's guilty plea on October 21, 2005.  On November 3, 2005, the Court modified the defendant's bond and imposed the special condition requiring the defendant to refrain from making any threatening communications and to continue mental health treatment.  It is the Government's understanding that the defendant has complied with his conditions of release since his guilty plea in October 2005.

### D.    The Defendant's Guilty Plea

On October 21, 2005, the defendant pleaded guilty to Count 8 of the Indictment charging him with mailing threatening communications in violation of Title 18, United States Code Section 876©.  In addition, the parties entered into a written plea agreement.  In the plea agreement, the parties stipulated to the following offense conduct:

> Between March 2004 and January 2005, the defendant made numerous threats to injure sportscasters at ESPN, a sports programming television network located in Bristol, Connecticut.  The defendant made these threats in two manners: (I) by sending handwritten letters to ESPN via the United States Postal Service and (ii) by leaving voice messages for certain ESPN sportscasters on their voice mail at ESPN.

> On January 8, 2005, for example, the defendant deposited in the mail, for delivery by the United States Postal Service, a two-page letter addressed to ESPN Programming at 935 Middle Street, Bristol, Connecticut 06010.  The two-page letter was handwritten by the defendant.  In the letter, the defendant threatened to injure the person of an ESPN sportscaster.  The defendant knowingly sent this letter to ESPN via the United States mail.

The parties also stipulated and agreed as to the defendant's "guideline calculation."  The parties agreed that the defendant's base offense level of twelve should be increased by two levels to reflect the fact that the defendant made more than two threats.  The parties further agreed that the defendant's offense level should be reduced by two levels to reflect his prompt acceptance of

8

responsibility, resulting in an adjusted offense level of twelve.  The parties estimated the

defendant's history category to be Category  I, resulting in a sentencing range of between 10 and

16 months and a fine guidelines range of between $3,000 and $30,000.

In the plea agreement and at the Rule 11 hearing, the defendant specifically agreed that he

would not appeal or collaterally attack in any proceeding, including a motion under 28 U.S.C. §

2255 and/or § 2241, the conviction or sentence of imprisonment imposed by the Court if that

sentence does not exceed sixteen (16) months, a three year term of supervised release and a

$250,000 fine.  Similarly, the Government agreed not to appeal a sentence imposed within or

above the stipulated sentencing guideline range.  The defendant expressly acknowledged that he

was waiving his appellate rights knowingly and intelligently.

### E.    The Defendant's Psychological Evaluations

At the guilty plea hearing, this Court ordered, pursuant to 18 U.S.C. § 3552©, that a

psychological evaluation be completed by Nick A. DeFillipis, Ph.D., in aid of sentencing.  Dr.

DeFillipis completed his evaluation on April 6, 2006.  In addition, Dr. DeFillipis had completed

a prior psychological evaluation of the defendant on April 11, 2005.

According to Dr. DeFillipis's reports, the defendant said that he believes that different

sportscasters are stealing his sales pitches.  The defendant said that ESPN sportscasters are using

words and phrases that the defendant uses in his sales pitches and also believes that the

sportscasters somehow have access to his personal papers and his personal taxes.  The defendant

started writing letters to ESPN asking them to stop and when it continued, he started writing

threatening letters.  The defendant readily admitted that sending threatening letters to people at

ESPN was an overreaction to what was happening, but continues to firmly believe that sportscasters around the country are stealing his ideas.

Dr. DeFillipis determined that the defendant "continues to present with a paranoid delusional state." Dr. DeFillipis reports that the defendant "continues to show indications of significant paranoia . . . [in addition,] he is experiencing some anxiety and may overreact to minor situations as though they were emergencies or dangerous personal threats. He tends to be loud, excitable, irritable, suspicious, and has a need to continually justify why he is doing what he is doing." Dr. DeFillipis further reports that while "a grandiose, suspicious, manic-like panic may result at times when he is under stress . . . the likelihood of violence occurring, however, is not significant at this time."

Dr. DeFillipis reports that the patient has clearly benefitted from his treatment, which includes anti-depressant and anti-psychotic medications, weekly psychotherapy sessions and monthly meetings with a psychiatrist for medication management. According to Dr. DeFillipis, the defendant feels that the counseling and medication help the defendant control his behavior and control any urges to write threatening letters to people. Dr. DeFillipis reports that in September 2005, when the defendant sent the threatening letter to the Sporting News in Chicago, the defendant ran out of his medication and was having some difficulty getting appointments with his psychiatrist for medication management and his psychotherapy counselor. Dr. DeFillipis opines that the September 2005 incident is evidence of the benefit of the treatment and the defendant's need for continued treatment.

Dr. DeFillipis opines that the defendant "will not pose a danger to himself or others if he remains in treatment." Dr. DeFillipis states that the defendant's condition "is a lifelong one" and

that the defendant "may need to continue [treatment] for the remainder of his life."  Dr.

DeFillipis further states that the defendant "is very likely to reengage in threatening behavior if

this treatment stops or if there is a lapse in treatment.  Thus, there should be very strict controls

over the patient's treatment compliance."  Dr. DeFillipis states that the defendant "seems to be

accepting of treatment and believes that it is helping him . . . but he does need to be closely

monitored."

## II.    **Sentencing in the Wake of *Booker***

In United States v. Booker, ___ U.S. ___, 125 S. Ct. 738 (2005), the Supreme Court held

that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles

articulated in Blakely v. Washington, 542 U.S. 296 (2004).  The Court determined that a

mandatory system in which a sentence is increased based on factual findings by a judge violates

the right to trial by jury.  As a remedy, the Court severed and excised the statutory provision

making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines

"effectively advisory."  Booker, 125 S. Ct. at 757.  This ruling results in a system in which the

sentencing court, while informed by the Guidelines, may impose any sentence within the

statutory maximum penalty for the offense of conviction.  The sentence will be subject to review

by the Court of Appeals for "reasonableness."  Id. at 766; see also United States v. Crosby, 397

F.3d 103 (2d Cir. 2005).

In the wake of Booker/Fanfan and Crosby, this Court must make a calculation under the

existing Sentencing Guidelines, and then consider the final guideline calculation when

determining the sentence to be imposed.  See Booker, 125 S. Ct. at 767 (holding that "[t]he

district courts, while not bound to apply the Guidelines, must consult those Guidelines and take

11

them into account when sentencing"); Crosby, 397 F.3d at 111-12.  The Second Circuit has further instructed that "that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.  Thus, it would be a mistake to think that, after Booker/Fanfan, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

The position of the United States is that, absent highly unusual circumstances, the sentence in a criminal case should be a Guideline sentence.  This view is shared by Congress and the Supreme Court.  As every Supreme Court justice in the various opinions in Booker recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history.  See, e.g., Booker, 125 S. Ct. at 761 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); Crosby, 397 F.3d at 114 ("We have every confidence that ... [district courts'] sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of 15 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress.  The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need

12

for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; © to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing, and should occur absent truly unusual circumstances.  Accordingly, a Guideline sentence is presumptively reasonable, and accommodates the congressional purpose, affirmed by the Supreme Court, of imposing fair sentences which are uniform to the extent possible.  The Government anticipates that only non-Guideline sentences will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate, absent truly extraordinary circumstances.

**III.    <u>Sentencing Recommendation</u>**

The Government respectfully recommends that the Court sentence the defendant within his Guidelines range.  As discussed above, the defendant's applicable Guidelines range is 10 to 16 months' imprisonment and a fine range of $3,000 to $30,000.  The Government submits that a sentence within the Sentencing Guidelines range results in a sentence that fully accords with the various factors set forth in 18 U.S.C. § 3553(a) and that is "reasonable."

The Government acknowledges that the Court appears to have the discretion to make a downward departure based on the defendant's diminished capacity pursuant to U.S.S.G.

§5K2.13.  Based on Dr. DeFillippis's psychological evaluations, there appears to be a factual basis to support a finding that the defendant suffered from a significantly reduced mental capacity that substantially contributed to the commission of the defendant's offense.  The Government defers to the Court's discretion as to whether a downward departure is warranted and appropriate in this case.

The Government respectfully submits that in exercising its discretion, the Court should consider, among other factors, the nature and seriousness of the defendant's threats and the impact that his racial and ethnic slurs and his threats of violence had on his victims and their families.  As one victim stated in a victim impact statement, "for all I knew, this guy would actually come to CT and seek me out.  Very scary.  Got to the point where I was afraid to check my voicemail."  The victim further stated that his family was "mortified" by this incident.  Given the nature of the defendant's threats and the impact his threats had on his victims, the Government submits that the defendant's Guideline range provides the Court with sufficient flexibility to render a fair and just sentence; that said, the Government defers to the Court's discretion as to whether a downward departure due to the defendant's diminished mental capacity is warranted and appropriate in this case.

The Government further submits that, in the event that the defendant is incarcerated, the defendant should be sent to a medical facility that can continue, as appropriate, the defendant's psychiatric treatment.  In addition, any term of supervised release or probation should include a comprehensive psychiatric treatment program that includes, among other things, psychotherapy counseling sessions, medication management sessions and closely-monitored oversight and case management.  Moreover, the psychiatric treatment program should require the defendant's strict

14

compliance with the program.

In addition, the Government respectfully recommends that any period of supervision also include, among other conditions, the following special conditions: (a) that the defendant avoid contact, either directly or indirectly, with any and all victims of his criminal conduct; (b) that the defendant restrict his travel to state of Georgia or other appropriate state where the defendant is then-living or, in the alternative, (c) that the defendant refrain from traveling to Connecticut or within 20 miles of ESPN's headquarters in Bristol, Connecticut; and (d) that the defendant refrain from sending any harassing or threatening correspondence to, or leaving any harassing or threatening messages for, any television, radio or other programming companies, including any sportscasters or other employees who work for such companies.

## V.    <u>Conclusion</u>

For the foregoing reasons, the Government respectfully requests that the Court sentence the defendant within the applicable guidelines range, but defers to the Court's discretion as to whether a departure due to the defendant's diminished mental capacity is warranted and appropriate in this case.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


GEOFFREY M. STONE
ASSISTANT U.S. ATTORNEY
Federal Bar No. CT25326
450 Main Street
Hartford, CT  06103
Tel.: (860) 947-1101
Fax: (860) 240-3291
geoffrey.stone@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May, 2006, a true and correct copy of the foregoing was served via fax upon defense counsel:

Gary Weinberger, Esq.
Federal Public Defender
10 Columbus Boulevard, Floor 6
Hartford, CT 06106-1976


By: _____
GEOFFREY M. STONE
Assistant U.S. Attorney

17